IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Civil Action No. 18-cv-03255-CMA-KMT

JUSTIN CUMMINGS,

    Plaintiff,

v.

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,

    Defendant.

---

**FINAL ORDER ON REVIEW OF ADMINISTRATIVE RECORD**

---

This matter is before the Court on Plaintiff's Motion for Summary Judgment Opening Brief (Doc. # 21), Hartford's Opening Brief for Bench Trial on the Papers in an ERISA Case (Doc. # 22), and the parties' Joint Motion for Determination of ERISA Case (Doc. # 27). The motions are ripe for the Court's review. For the reasons set forth below, Plaintiff's Motion for Summary Judgment is denied and judgment enters in Defendant's favor.

    I.    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff Justin Cummings has been diagnosed with multiple medical conditions, including degenerative disc disease, Scheuermann's Disease, and myofascial pain syndrome, which is a chronic pain disorder. Mr. Cummings asserts a claim for entitlement to long term disability ("LTD") benefits under the Group Long Term Disability

Plan for Employees of Free-Port McMoran Corporation ("the Plan"), contending that he cannot work in 'Any Occupation' within the meaning of the Plan.[1]

Defendant Hartford Life and Accident Insurance Company ("Hartford") is both the claim administrator responsible for determining eligibility for LTD benefits under the Plan and the funder[2] of the benefits. The Plan gives Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." (Doc. # 16-1 at 33.) To qualify for LTD benefits, the Plan requires that a claimant be "prevented from performing one or more of the Essential Duties of Any Occupation." (*Id*. at 22.) To establish his or her entitlement to benefits under the Plan, a claimant must provide proof of loss satisfactory to Hartford. (*Id*. at 17.) Hartford may request proof of loss throughout a claimant's disability. (*Id*.)

Mr. Cummings received LTD benefits under the Plan from May 3, 2010, to January 19, 2018. On January 19, 2018, Hartford terminated Mr. Cummings' LTD benefits after a year-long investigation of Mr. Cummings' entitlement to benefits. Hartford's investigation began on December 30, 2016, when it interviewed Mr. Cummings by telephone. (*Id*. at 125–26.) Mr. Cummings reported that he was raising four children by himself and that his claim for Social Security Disability Insurance was denied. Thereafter, Hartford referred Mr. Cummings' file to a private investigation firm for surveillance, which took place on three days in March 2017. (Doc. # 16-1 at 109–10;

---

[1] The exhibits filed at Doc. # 16 constitute the Administrative Record in this matter. The Court cites to the docket number of the exhibit (e.g., Doc. # 16-1) and the page number from the Administrative Record (e.g., at 106–257).

[2] Hartford issued Group LTD Policy No. GLT-675130 to fund the Plan's LTD benefits. (Doc. # 16-1 at 5.)

2

Doc. # 16-5 at 964.) The surveillance captured Mr. Cummings engaging in various activities at and away from his home. Hartford gathered that Mr. Cummings "neither limped nor exhibited signs of pain or discomfort during the surveillance" and that his activities reflected a greater level of functionality than Mr. Cummings had self-reported. (Doc. # 22 at 5; Doc. # 16-5 at 963–65; Doc. # 16-10 at 1846.)

On June 26, 2017, Hartford conducted a face-to-face interview with Mr. Cummings in his home. (Doc. # 16-5 at 899–924.) Hartford interpreted Mr. Cummings' behavior and responses during the interview to be inconsistent with his behavior observed during surveillance. *Compare* (*id*. at 901–03, 911, 914, 916–20) *with* (Doc. # 16-1 at 104).

Hartford thereafter referred Mr. Cummings' file to a Medical Case Manager ("MCM"), a registered nurse on Hartford's staff, for review and clarification of Mr. Cummings' restrictions and limitations. (*Id*. at 103–05.) The MCM found that Mr. Cummings' "observed activities exceed his reported abilities." (*Id*. at 104.) The MCM sent the surveillance footage, a summary of the footage, the June 26, 2017 interview, and a statement of disability and estimation of current functional abilities to Mr. Cummings' primary health care providers for comment. (Doc. # 16-1 at 103; Doc. # 16-2 at 359–62.) Nurse Practitioner Kelly Colbert ("NP Colbert") reported no changes in Mr. Cummings' condition and did not comment on the surveillance footage or interview. (Doc. # 16-5 at 834–35.) Nurse Practitioner Lisa Hammond responded that such evaluation was beyond her scope of practice. (*Id*. at 831.)

3

The MCM attempted to have Mr. Cummings attend an Independent Medical Examination ("IME") because his "limitations and functional capabilities remain[ed] inconsistent and unclarified." (Doc. # 16-1 at 96.) However, Mr. Cummings was unable to attend or reschedule the IME, and Hartford "exhausted all . . . options to schedule [Mr. Cummings] for an IME within [its guidelines]." (*Id*. at 77–80, 82–83.) Hartford subsequently referred Mr. Cummings' file to MES Peer Review Services, an independent third-party vendor, which assigned the review of Mr. Cummings' file to Dr. Joseph Rea, who is board-certified in Occupational Medicine. (*Id*. at 75; Doc. # 16-5 at 829.)

During the peer review process, Dr. Rea spoke with two of Mr. Cummings' treating physicians and reviewed his medical records, the surveillance footage, and the June 26, 2017 interview. *See generally* (*id*. at 824–29). Dr. Rea concluded that Mr. Cummings' functionality would "roughly correspond to a Light Physical Demand Level category" with certain functional limitations. Hartford prepared an Employability Analysis Report ("EAR") that incorporated the functional limitations in Dr. Rea's report and Mr. Cummings' educational and work history. (Doc. # 16-4 at 795–99; Doc. # 16-5 at 800–21.) Finding several occupations within Mr. Cummings' abilities, Hartford determined that Mr. Cummings no longer satisfied the Plan's 'Any Occupation' definition. On January 19, 2018, Hartford issued its determination in which it summarized the grounds for its decision that Mr. Cummings did not qualify for LTD benefits, including Dr. Rea's peer review report and the corresponding EAR. (Doc. # 16-2 at 346–53.)

Mr. Cummings appealed Hartford's termination of his LTD benefits. *See generally* (Doc. # 16-4 at 603–741). As part of his appeal, Mr. Cummings submitted, *inter alia*, a Functional Capacity Evaluation report ("FCE") by Daniel Ward ("PT Ward") and an IME report by Dr. Timothy Hall. (*Id*. at 698–724, 734–38.) Both the FCE and the IME were conducted as part of Mr. Cummings' appeal, and both PT Ward and Dr. Hall concluded that Mr. Cummings is incapable of full-time work. Mr. Cummings also submitted an EAR that relied on the FCE by PT Ward and IME by Dr. Hall in concluding that Mr. Cummings was unable to work in any occupation, as well as medical articles relating to chronic pain. (Doc. # 16-3 at 583–99; Doc. # 16-4 at 600–02.)

Hartford conducted the initial review of Mr. Cummings' appeal submissions on October 3, 2018. It noted that both the FCE and the IME identified "some function consistent with sedentary to light work which is supported by the surveillance video and the [Independent Medical Review] by Joseph Rea." (Doc. # 16-1 at 53.) Hartford referred the file to another independent, third-party vendor, PDA, to conduct a peer review. (*Id*. at 50.) PDA assigned the review to Dr. Michael Jacobs, who is board-certified in Physical Medicine and Rehabilitation, Pain Medicine, and Occupational Medicine. (Doc. # 16-3 at 549.)

Dr. Jacobs reviewed Mr. Cummings' medical records including, *inter alia*, a 2014 IME, three MRIs, office notes from various physicians, the surveillance footage, PT Ward's FCE, and Dr. Hall's IME. (*Id*. at 543.) Dr. Jacobs agreed with the diagnoses of degenerative disc disease and myofascial pain, as well as some portion of both PT Ward's FCE and Dr. Hall's IME. (*Id*. at 545–46.) He disagreed with PT Ward and Dr.

5

Hall's characterization of Mr. Cummings' restrictions and limitations and their ultimate conclusions that Mr. Cummings is unable to work. Dr. Jacobs concluded that Mr. Cummings could perform eight hours of activities, five days per week, with reasonable restrictions and limitations. (*Id*. at 546–47.) Hartford prepared an addendum EAR based on the functional limitations in Dr. Jacobs' report. The addendum EAR again identified several occupations within Mr. Cummings' abilities. (*Id*. at 331–32.)

Hartford denied Mr. Cummings' appeal and upheld its decision to terminate Mr. Cummings' benefits on October 26, 2018. (Doc. # 16-2 at 330–35.) Mr. Cummings initiated the instant action on December 18, 2018. (Doc. # 1.)

## II. **STANDARD OF REVIEW**

Parties to an ERISA case may present a dispositive motion either as a motion for a bench trial on the papers or as a motion for summary judgment. *See Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1307 n. 1 (10th Cir. 2007), *cert. denied*, 553 U.S. 1079 (2008). In the instant case, Plaintiff's Motion for Summary Judgment "is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006)). Instead, "this Court treats the case as presenting cross-appeals under Fed. R. at App. P. 28.1." *Sullivan v. Ltd. Brands, Inc. Long–Term Disability Program*, 2008 WL 659641, at *1 n. 2 (D. Colo. Mar. 5, 2008). It evaluates the reasonableness of a plan

administrator's decision based on the evidence in the administrative record and resolves the case on the pending papers. *Panther v. Synthes*, 380 F. Supp. 2d 1198, 1207 n.9 (D. Kan. 2005).

## A. ARBITRARY AND CAPRICIOUS STANDARD

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case the courts apply an arbitrary and capricious standard of review. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Trujillo v. Cyprus Amax Minerals Co. Ret. Plan Comm.*, 203 F.3d 733, 736 (10th Cir. 2000) (stating that an arbitrary and capricious standard applies where the plan gives the plan administrator discretionary authority). In the instant case, both sides agree that the Plan explicitly grants Hartford the discretionary authority to determine claims for LTD benefits. *See* (Doc. # 16-1 at 33). Therefore, the arbitrary and capricious standard will apply to Hartford's denial of benefits.[3]

Under the arbitrary and capricious standard, the administrator's decision need not be the only logical one or the best one; the decision will be upheld so long as it is "grounded on any reasonable basis." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999). "The reviewing court need only assure that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end." *Nance v.*

---

[3] Mr. Cummings initially argued that the Court should apply a *de novo* standard of review pursuant to Colo. Rev. Stat. § 10-3-1116. (Doc. # 21 at 4.) He withdrew this argument in his Response Brief, conceding that the Plan at issue falls outside the scope of Colo. Rev. Stat. § 10-3-1116. (Doc. # 25 at 1.)

7

*Sun Life Assurance Co. of Canada*, 294 F.3d 1263, 1269 (10th Cir. 2002). "Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) (citing *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 380 n. 4 (10th Cir. 1992)). "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].'" *Id*. (citing *Sandoval*, 967 F.2d at 382 (quoting *Flint v. Sullivan,* 951 F.2d 264, 266 (10th Cir. 1991) (alteration in original)).

## B.     CONFLICT OF INTEREST

Mr. Cummings argues that the Court should ratchet its deference down to a *de novo* standard because of Hartford's conflict of interest. (Doc. # 21 at 4–5.) "[Hartford] is both the administrator and insurer of the [Plan]. As such, an inherent conflict exists." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1283 (10th Cir. 2002) (citing *Pitman v. Blue Cross & Blue Shield of Oklahoma*, 217 F.3d 1291, 1296 (10th Cir. 2000)). "[I]f a conflict of interest exists, the reviewing court 'must decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict.'" *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) (quoting *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir. 1996)); *see also Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1357 (10th Cir. 2009) ("The importance we attach to the existence of a conflict of interest is proportionate to the likelihood that the conflict affected the benefits decision."), *cert. denied*, 560 U.S. 939 (2010). However, a conflict is given less weight "when the

conflicted party 'has taken steps to reduce potential bias and to promote accuracy." *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1155 (10th Cir. 2009) (quoting *Metropolitan Life Ins. Co. v. Glenn*, 544 U.S. 105, 117 (2008)).

In the instant case, Hartford took steps to reduce potential bias and promote accuracy by hiring two independent, board-certified physicians to conduct a peer review of Mr. Cummings' file. (Doc. # 16-1 at 50, 75, 78; Doc # 16-3 at 549; Doc. # 16-5 at 829.) *See Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1193 (10th Cir. 2009) (giving limited weight to conflict-of-interest factor where administrator hired two independent physicians and thus did not rely solely on the evaluations and medical opinions of its own staff). Mr. Cummings has not offered evidence supporting a high likelihood that Hartford's conflict of interest affected its decision, and he retains the burden of showing Hartford abused its discretion.[4] The Court therefore "give[s] the conflict-of-interest factor limited weight in evaluating whether [Hartford] abused its discretion." *Holcomb*, 578 F.3d at 1193 (citing *Glenn*, 544 U.S. at 115 (stating that the conflict-of-interest factor "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy")).

### III. <u>ANALYSIS</u>

The parties do not dispute Mr. Cummings' diagnoses or that he is disabled. Instead, the chief dispute in this case is the extent to which Mr. Cummings' chronic pain

---

[4] *See, e.g.*, *Hancock*, 590 F.3d at 1155; *Graham*, 589 F.3d at 1357; *McClenahan v. Metro. Life Ins. Co.*, 416 F. App'x 693, 697 (10th Cir. 2011) ("The plaintiff nevertheless retains the burden of showing abuse.") (citations omitted).

affects his functionality and, therefore, his ability to work. The Court finds that Hartford's decision to terminate Mr. Cummings' LTD benefits was predicated on a reasonable basis, and thus satisfies the arbitrary and capricious standard of review. *See Graham*, 589 F.3d at 1357.

## A. CREDIBILITY OF PLAINTIFF'S SELF-REPORTING

In cases involving a disability that is difficult or impossible to corroborate through objective evidence, such as in cases concerning fibromyalgia, "a plan administrator's medical inquiry naturally involves questions regarding the claimant's credibility." *Rizzi v. Hartford Life & Acc. Inc. Co.*, 383 F. App'x 738, 752 (10th Cir. 2010). The instant case, which concerns chronic pain syndrome, is such a case. Disputes of Mr. Cummings' credibility and the accuracy with which he has represented his functionality have manifested in two ways—i.e., in Hartford's consideration of the video surveillance of Mr. Cummings and in Hartford's valuation of medical opinions that rely on Mr. Cummings' self-reporting.

### 1. Video Surveillance

Mr. Cummings disputes the weight Hartford attributed to the surveillance footage of Mr. Cummings.[5] However, "[r]eliance on surveillance evidence in conjunction with medical evidence is not improper." *See Rizzi*, 383 F. App'x at 751. Drs. Rea and Jacobs

---

[5] Mr. Cummings cites to *Kaferly v. Metro. Life Ins. Co.*, 189 F. Supp. 3d 1085, 1100–01 (D. Colo. 2016), in which Judge Martinez found that video surveillance of that ERISA plaintiff was "inherently anecdotal" and "at most inconclusive," to support his position. *Kaferly* is distinguishable from the instant case because the defendant in *Kaferly* terminated the plaintiff's LTD benefits without any review by a physician. 189 F. Supp. 3d at 1101. In this instance, two physicians reviewed Mr. Cummings' medical records and the surveillance video. Hartford relied on the conclusions of those physicians in making its determination.

reviewed the surveillance footage in addition to extensive medical documentation and concluded thereafter that Mr. Cummings' functionality exceeded what he had self-reported.[6] Pursuant to *Rizzi*, the Court finds that Hartford assigned reasonable weight to the surveillance footage in reaching its determination.[7]

    2.    <u>Hartford's Consideration of Medical Opinions Dependent on Mr. Cummings' Self-Reporting</u>

Mr. Cummings repeatedly argues that Hartford acted arbitrarily and capriciously in finding that he was capable of work under the Plan's terms when his examining physicians concluded the opposite. As a general matter, an ERISA claimant's "pain reports for their diagnoses . . . cannot be unchallengeable. That would shift the discretion from the administrator, as the plan requires, to the physicians chosen by the applicant, who depend for their diagnoses on the applicant's reports to them of pain." *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869, 878 (9th Cir. 2004). As discussed in more detail below, Hartford and the peer reviewing doctors

---

[6] The surveillance revealed, from the perspectives of Hartford's MCM, Dr. Rea, and Dr. Jacobs, inconsistencies with Mr. Cummings' representations of his functionality. (Doc. # 22 at 4–5, 9.) For example, Hartford notes that Mr. Cummings, in the surveillance footage, set up a folding chair on the driver's side of his vehicle, "utilized the chair as a step stool, leaned over the engine area, utilized a socket wrench with his right arm and hand stretched forward, worked on the engine with his right hand and utilized his left hand atop the front grill frame for support." (Doc. # 16-5 at 972.) During a subsequent face-to-face interview with Hartford, Mr. Cummings "denied being able to do any maintenance or repairs on a vehicle." (Doc. # 16-5 at 903, 919–20.) Hartford notes that, "[Mr.] Cummings neither limped nor exhibited signs of pain or discomfort during the surveillance," yet he "walked in a slow guarded manner" during the face-to-face interview. (Doc. # 22 at 5; Doc. # 16-5 at 901, 963–65; Doc. # 16-10 at 1846.)

[7] Mr. Cummings argues that roughly 38 minutes of video surveillance cannot rationally reflect his workability for a whole workday or week. (Doc. # 21 at 13; Doc. # 25 at 4–9.) The Tenth Circuit rejected a similar argument in *Rizzi*, setting aside the plaintiff's argument that Hartford's "surreptitious surveillance [wa]s [not] of any value when it fail[ed] to demonstrate any ability to perform work activity on a continuous basis." 383 F. Appx. at 751.

11

generally agreed with the examining physicians' conclusions that stemmed from objective evidence but disagreed with the examining physicians' characterizations of Mr. Cummings' functionality, which heavily relied on his self-reporting. The Court finds that Hartford reasonably challenged Mr. Cummings' representations of his pain and functionality in light of the surveillance footage and reasonably placed greater value on the conclusions of Drs. Rea and Jacobs than the conclusions of the examining physicians. *See Williams v. Metro. Life Ins. Co.*, 459 F. App'x 719, 726–27 (10th Cir. 2012) ("Although the record reveals a genuine difference of medical opinion between the reviewing physicians [who concluded that the plaintiff could work] and the examining physicians [who concluded that the plaintiff could not work], the circumstances make [the defendant's] reliance on the reviewing physicians' reports reasonable.").

**B. PEER REVIEW REPORTS**

Mr. Cummings argues that Hartford's determination was not based on substantial evidence because Hartford did not perform a physical evaluation of Mr. Cummings and it relied on Dr. Jacobs' opinion in denying his appeal. (Doc. # 21 at 9–10.) The Court disagrees with each of these arguments and finds that Dr. Rea's report bolsters the reasonableness of Hartford's decision at both the initial determination and appellate stages.

1. <u>Lack of Physical Examination</u>

Mr. Cummings' argument that Hartford's determination is arbitrary and capricious because it did not examine Mr. Cummings is without merit. Physical examinations are not required to uphold the denial of ERISA benefits. *See, e.g., Nelson v. Aetna Life Ins.*

12

*Co.*, 568 F. App'x 615, 620 (10th Cir. 2014) (upholding administrator's determination without physical examination where specialists reviewed voluminous medical records and spoke to the plaintiff's treating physician); *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1015 (10th Cir. 2004) (stating that independent medical examinations are "helpful" but "not required" when an administrator has a conflict of interest), *abrogated on other grounds by Glenn*, 544 U.S. 105. Indeed, "in some cases, reviewing physicians 'might have the advantages of both impartiality and expertise.'" *Williams*, 459 F. App'x at 726 (quoting *Dixon v. Massanari,* 270 F.3d 1171, 1177 (7th Cir. 2001)). The Court will not construe the lack of a physical evaluation in the instant case as evidence of an inadequately reasoned decision, particularly where Hartford made a good faith effort to schedule a physical evaluation of Mr. Cummings at the initial determination stage.[8]

2.  Dr. Jacobs' Report

The Court further disagrees with Mr. Cummings' contention that Hartford acted arbitrarily and capriciously by relying on Dr. Jacobs' report in its denial of Mr. Cummings' appeal. Dr. Jacobs reviewed extensive medical records,[9] and his report indicates thorough consideration of the information available. For example, Dr. Jacobs

---

[8] Mr. Cummings was unable to attend or reschedule the IME, and Hartford "exhausted all . . . options to schedule [him] for an IME within [its guidelines]." (Doc. # 16-1 at 77–80, 82–83.) Hartford thereafter referred Mr. Cummings' file for the first peer review by Dr. Rea. (*Id.* at 75.)

[9] Dr. Jacobs reviewed the 2014 IME by Dr. Ogrodnick, office notes and restrictions and limitations by Dr. Wenrich in 2014, office notes by NP Colbert in 2017, unspecified records by Dr. Eastlund in 2017, office notes by Alicia Walker in 2018, the 2018 FCE by Mr. Ward, the 2018 IME by Dr. Hall, the surveillance footage from May 2017, and three MRIs of Mr. Cummings' spine from 2016. (Doc. # 16-3 at 543.) Mr. Cummings' argument that Dr. Jacobs failed to consider records from Dr. Eastlund is baseless. *See* (Doc. # 16-3 at 544) (summarizing records from Dr. Eastlund).

agreed with the diagnoses of myofascial pain and degenerative disc disease and noted that Mr. Cummings has no radiculopathy or neurological deficits but does have mild spinal range of motion limitations. He also considered that Mr. Cummings is on pain medication and noted that his work should be restricted accordingly, even though there was no documentation of Mr. Cummings experiencing significant side effects from that medication. Further, he specifically noted his agreement[10] and disagreement[11] with the 2014 IME by Dr. Ogrodnick, the FCE by PT Ward, and the IME by Dr. Hall. *See Williams*, 459 F. App'x at 727 (upholding administrator's termination of benefits where "[t]he reviewing physicians generally agreed with the examining physicians' diagnoses but disagreed with their conclusions about [the plaintiff's] ability to work.").

To the extent Mr. Cummings argues that Hartford erred by crediting Dr. Jacobs' disagreement with the examining and treating physicians, ERISA "plan administrators are not obliged to accord special deference to the opinions of treating physicians," *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003), and the Court may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation," *Davis v. Unum*

---

[10] Dr. Jacobs stated that he agreed with Dr. Ogrodnick that it would be reasonable to limit Mr. Cummings' lifting, carrying, and bending, found PT Ward's recommendations generally reasonable, and agreed with Dr. Hall's assessment that myofascial pain is the primary source of Mr. Cummings' symptoms. (Doc. # 16-3 at 546.)

[11] Dr. Jacobs disagreed with each practitioner's ultimate assessment of Mr. Cummings' restrictions. He noted that Dr. Ogrodnick's "restrictions are too strict for the claimant's symptoms of axial myofascial pain without neurological or significant ROM deficits," that "the surveillance videos make it clear that the claimant should be able to stand/walk for more than 3 hours per day, as well as an ability to bend, reach, and maintain awkward postures" contrary to PT Ward's assessment, and that he disagreed with Dr. Hall's "conclusion that the claimant cannot perform activities for 8-10 hours per day" because Dr. Jacobs "believe[d] the claimant could perform 8 hours of activities for 5 days per week" with reasonable restrictions and limitations. (*Id.*)

*Life Ins. Co. of Am.*, 444 F.3d 569, 578 (7th Cir. 2006) (quoting *Nord*, 538 U.S. at 834). Further, "the job of weighing valid, conflicting professional medical opinions is not the job of the courts; that job has been given to the administrators of ERISA plans." *See Corry v. Liberty Life Assur. Co. of Bos.*, 499 F.3d 389, 401 (5th Cir. 2007). Reaching a decision amid conflicting medical evidence is a question of judgment left to Hartford under the arbitrary and capricious standard. *Davis*, 444 F.3d at 578.

   3.   Dr. Rea's Report

The peer review conducted by Dr. Rea at the initial determination stage lends further support to Hartford's termination of benefits. Dr. Rea's report reflects a thorough and reasonable review process. *See generally* (Doc. # 16-5 at 824–29). Dr. Rea spoke with two of Mr. Cummings' treating physicians—i.e., Dr. Longfellow and Dr. Selano. Dr. Selano reported that "his group did not assess disability or questions surrounding it." (*Id.*) Dr. Longfellow stated that "in view of the long-standing difficulty with the back there should be consideration for reduced bending and lifting," but he did not indicate that Mr. Cummings was incapable of work. *See* (*id.*). Dr. Rea reviewed and summarized Mr. Cummings' medical records, the surveillance footage, and the June 26, 2017 interview in his report.[12] Ultimately, he arrived at the conclusion that Mr. Cummings could work at a Light Physical Demand Level category with some functional limitations, which is

---

[12] Mr. Cummings asserts that "Dr. Rea did not address the effects of Mr. Cummings['] use of medication, including narcotic medication" and the "effects this would have on his employment." (Doc. # 21.) This argument is baseless. Dr. Rea's review of the medical records included Mr. Cummings' use of medication. Dr. Rea specifically noted in his report that Mr. Cummings' "pain medication regimen helped control pain to the extent it would allow [him] to stay out of bed during the day and enable some function throughout the day. The medications overall reduced the neck and upper extremity pain by 50%-60%." (Doc. # 16-5 at 827.)

15

consistent with Dr. Longfellow's recommendation that "there should be consideration for reduced bending and lifting."

The Court finds that Hartford's reliance upon the peer review reports of Drs. Rea and Jacobs was reasonable and supported by substantial evidence. *See Williams*, 459 F. App'x at 726–27.

**C.    OTHER INFORMATION**

1. <u>Hartford's Prior Approval of Plaintiff for Benefits</u>

Mr. Cummings argues that Hartford's prior payment of benefits weighs against this Court's upholding of Hartford's decision to discontinue payments. (Doc. # 21 at 20.) However, "paying benefits does not prevent an administrator from denying benefits when the administrator becomes aware of new information about the claimant's eligibility for benefits." *Williams*, 459 F. App'x at 731 (citing *Kecso v. Meredith Corp.*, 480 F.3d 849, 854 (8th Cir. 2007)). Put differently, "unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." *Id*. In the instant case, Hartford became aware of new information about Mr. Cummings' eligibility for benefits through the surveillance footage, the June 26, 2017 interview with Mr. Cummings, and the peer reviews by Drs. Rea and Jacobs. Therefore, the previous payment of benefits does not weigh against the propriety of Hartford's decision to discontinue payments.

2. <u>Supplemental Medical Authority</u>

Mr. Cummings argues that Hartford acted arbitrarily and capriciously by not

considering the supplemental medical authority he presented in his appeal. (Doc. # 21 at 14–16; Doc. # 25 at 17.) "A plan administrator abuses its discretion when it 'fail[s] to examine a **material** portion of the relevant evidence.'" *Williams*, 459 F. App'x at 729 (quoting *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1120–21 (10th Cir. 2006)) (emphasis added); *see also Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1326 (10th Cir. 2009) (concluding plan administrator abused its discretion when it inexplicably disregarded highly probative medical evidence and affidavits favorable to claimant). The Court finds that the medical articles Mr. Cummings submitted were neither a material portion of the relevant evidence nor highly probative of Mr. Cummings' functionality. As such, Hartford did not abuse its discretion by failing to consider them.

3. <u>Hartford's Failure to List Occupations Meeting the Plan's Financial Requirements in its Appeal Determination Letter</u>

Finally, Mr. Cummings argues that Hartford did not fulfill its obligations under the Plan by failing to inform him in its final termination letter of how the listed employment positions fulfilled the earning standard required under the 'Any Occupation' definition of the Plan. (Doc. # 21 at 17–18.) Hartford responds with a comprehensive overview of its process with regard to the earning requirement:

> The Addendum EAR identified occupations "when screening for occupations earning at least $12.19/hour," which was the threshold for the wage requirement of the Any Occupation Definition. Rec. 528. The Addendum EAR then listed the monthly median wage for the occupations best matching Cummings' abilities. Rec. 529. The Addendum EAR stated that these "median monthly wages for the identified occupations … all meet or exceed the required earnings potential of $2,112.31/month." *Id*. In its documentation of the grounds for the appeal determination, Hartford noted the consideration of the required median monthly wage. Rec. 42 (Oct. 26, 2018 entry). Hartford's appeal letter incorporated the claim determination letter of October 26, 2018 for "applicable contractual provisions outlined in

> the Policy," and the claim determination listed the salaries of the occupations identified in the EAR, which "are above 60% of your Indexed Pre-Disability Earnings, as required by the definition of Any Occupation." Rec. 330; 351. Hartford listed the occupations identified in the Addendum EAR in the appeal determination letter but did not include the monthly median wages of those occupations. Rec. 334.

(Doc. # 26 at 22–23) (footnotes omitted).

Mr. Cummings points to no case law or contractual provision that indicates Hartford's process did not satisfy its obligations under the Plan. *See generally* (Doc. # 21 at 17–18). Mr. Cummings quotes the 'Any Occupation' and 'Indexed Pre-disability Earnings' definitions of the Plan, but neither definition imposes a reporting requirement on Hartford. *See* (Doc. # 16-1 at 21, 22). After review of the administrative record and Hartford's thorough procedure described above, the Court agrees that "[a]lthough Hartford did not include the monthly median wages . . . in the appeal determination letter, the Addendum EAR and the appeal determination documentation show that Hartford reasonably and correctly considered the Any Occupation Definition's wage requirement in assessing the vocational issues of the appeal review." (*Id*.) Hartford's omission of monthly median wages from the appeal determination letter did not yield an arbitrary and capricious decision.

## IV. **CONCLUSION**

For the foregoing reasons, it is ORDERED as follows:

- Plaintiff's Motion for Summary Judgment Opening Brief (Doc. # 21) is DENIED;
- the relief requested in Hartford's Opening Brief for Bench Trial on the Papers in an ERISA Case (Doc. # 22) is GRANTED and Hartford's determination is upheld; and

18

- the Clerk of the Court shall enter judgment in Defendant Hartford's favor.

DATED: March 13, 2020

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge